| | | |
|---|---|---|
| BRANDI POWERS on Behalf of Herself And All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) | CAUSE NO. 1:08-cv-208-PPC |
| | ) | |
| CENTENNIAL COMMUNICATIONS CORP., | ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

This is a wage payment dispute that has become rather unwieldy. Brandi Powers claims that her former employer, Centennial Communications Corp., failed to properly pay her sales commissions and overtime payments. Powers seeks class certification under Rule 23 and certification of a collective action under the Fair Labor Standards Act [DE 9]. Powers also seeks to amend her complaint [DE 32]. Previously, I dismissed claims brought by Powers under Indiana's Wage Payment Statute, *see* May 18, 2009 Order [DE 65]. For the reasons explained below, both the motion for class certification and motion to amend are granted in part and denied in part.

## BACKGROUND

Centennial is a provider of wireless and telecommunications services, and Powers worked for them as a sales representative for a number of years. Powers asserts several claims against Centennial, all relating to alleged improprieties with how she was paid by Centennial. Her income was composed of both a set weekly salary as well as monthly commissions. Pl.'s

Mem. ISO Class Cert. [DE 10] at 2-3. The dispute mainly involves whether Centennial calculated her overtime correctly and paid her in a timely fashion. Although she was a salaried employee, she was also entitled to overtime if she worked more than 40 hours a week. Sales Compensation Plan [DE 9-5] at 2-3.

Calculating Powers' compensation is complex. Centennial had to first determine her regular hourly rate, and this involved factoring in both her salary and her commissions. Adding to the complexity, the commissions were somewhat amorphous figures, changing even after they were paid out because of customers' deactivations, rate plan downgrades, and feature downgrades, often made several months after the initial sale. Kruse Aff. [DE 29-2], ¶ 17. Powers maintains that Centennial made these calculations incorrectly, and has demonstrated several, undisputed instances where her commission payments did not match her sales record and at least two months where accrued overtime was not paid at all. Pl.'s Reply ISO Class Cert. [DE 36] at 5-8. She also claims that Centennial's general practice is to make deductions, or "charge backs," from an employee paycheck to make up for the commission overpayment on previous paychecks. *Id.* at 7. She argues that Centennial's handling of her paychecks was improper and amounted to violations of both federal and state laws.

One of the laws brought into play from the initial complaint is the Indiana Wage Payment Statute, Indiana Code § 22-2-5 *et. seq.*, which requires employers to pay each employee "at least semimonthly or biweekly" and for payment to be made "for all wages earned to a date not more than ten (10) days prior to the date of the payment." Earlier, I dismissed Powers' Wage Payment Statute claims after finding that an exemption in that statute for salaried employees eligible for overtime under the FLSA is applicable to Powers. May 18, 2009 Order [DE 65]. I also denied

Powers' request to certify to the Indiana Supreme Court the question of whether that exemption was constitutional under Indiana's Privileges and Immunities clause. *Id.*

In addition to the Wage Payment Statute, Powers seeks relief under the Indiana Wage Deduction Statute, Indiana Code § 22-2-6 *et. seq.*, for deductions made for an invalid purpose – in this case, the charge backs. Her original complaint sought relief for the violation of the Wage Deduction Statute which, according to Powers, "in turn violates the Wage Payment Statute." Complaint [DE 1], ¶ 10. She now seeks to amend her claim with an alternative claim based solely on the Wage Deduction Statute. Mot. to Am. [DE 32-2], ¶ 11. Her motion to amend also includes a breach of contract claim based on the commission payment discrepancies. *Id.*, ¶ 14. It also asserts a new Wage Payment Statute claim for Centennial's failure to pay all commissions due and owing, *id.*, ¶12, but as mentioned, Powers has since been found to be excluded from relief under the Wage Payment Statute. Lastly, Powers is also pursuing claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* for Centennial's failure to pay overtime at time and a half and on a timely basis. *Id.*, ¶ 9.

## DISCUSSION

### I.    Certification of Collective Action

Under 29 U.S.C. § 216(b), an employee may bring an action to recover unpaid overtime compensation on "behalf of himself . . . and other employees similarly situated." This is known as a "collective action." *Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099, 1101 (7th Cir. 2004). No employee may be a party plaintiff to a collective action "unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

Collective actions under the FLSA are fundamentally different than class actions under Federal Rule of Civil Procedure 23. Plaintiffs in a collective action must "opt-in" to the action to be bound by a judgment while plaintiffs in a Rule 23 class action must "opt-out." *See King v. General Electric Co.*, 960 F.2d 617, 621 (7th Cir. 1992); *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 580 (7th Cir. 1982). Because of the "opt-in" requirement, a representative plaintiff in a collective action has to be able to inform other individuals who may have similar claims that they may join his lawsuit. *Austin v. CUNA Mut. Ins. Soc'y*, 232 F.R.D. 601, 605 (W.D. Wis. 2006).

Section 216(b) does not explicitly provide for court-ordered notice. Nonetheless, the Supreme Court has held that, in appropriate cases, district courts have the discretion to implement § 216(b) by facilitating notice to potential plaintiffs. *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Such court-authorized notice serves the broad, remedial purpose of the FLSA and comports with the court's interest in managing its docket. *Id*. at 172-74.

The FLSA neither defines the term "similarly situated" nor instructs judges when to exercise their discretion and authorize notice to potential plaintiffs. Nevertheless, a majority of federal courts have held that, for a case to proceed as a collective action, the Plaintiffs must make a modest factual showing at the outset of the case that they and the other employees were victims of a common policy or plan that violated the law. *See, e.g., Russel v. Illinois Bell Telephone* Co., 575 F.Supp.2d 930, 934 (N.D. Ill. 2008); *Ashley v. Lake County*, 2007 WL 1549926, at *2 (N.D. Ind. May 24, 2007); *Sipas v. Sammy's Fishbox, Inc.*, 2006 WL 1084556, at *2 (S.D.N.Y. Apr. 24, 2006); *Kreher v. City of Atlanta*, 2006 WL 739572, at *2 (N.D. Ga. March

20, 2006); *Austin*, 232 F.R.D. at 605; *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 865 (S.D. Ohio 2005); *Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 117 (D.D.C. 2004); *Mielke v. Laidlaw Transit*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004)*; Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003); *Realite v. Ark Restaurants Corp.*, 7 F.Supp. 2d 303, 306 (S.D.N.Y. 1998).

If Plaintiffs make this modest factual showing, then notice and an opportunity to "opt-in" can be sent to those employees who are similarly situated to the named Plaintiffs. *See Cameron-Grant v. Maxim Healthcare Servs. Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003); *Flores*, 289 F. Supp. 2d at 1045; *Austin*, 232 F.R.D. at 606. The action then proceeds through discovery as a representative or collective action. Though lenient, the "modest factual showing" standard is not a mere formality. So, for example, evidence that an employer made errors in paying two employees out of fifty was found to be not enough of a factual showing that the employer had a common policy to violate the FLSA. *Flores*, 289 F.Supp.2d at 1045-46.

In this case, Powers has two theories of liability under the FLSA. The first concerns Centennial's failure to pay her commissions and overtime. The second theory is that the timing of the overtime payments that she did receive violated the FLSA. Powers seeks to have this case proceed as a collective action under both theories.

A.    The Failure to Pay Overtime Claim

Powers claims, and Centennial acknowledges, that for several months she was paid less in commission than she was owed, based on her sales for the corresponding months. Pl.'s Reply ISO Class Cert. [DE 36] at 5-6; Def.'s Surreply [DE 62] at 4. Since commissions are to be included in her regular rate, 29 C.F.R. § 778.117, and overtime is to be calculated based on the

regular rate, 29 U.S.C. § 207, Powers was not paid the correct overtime for those months in which she was paid the incorrect commissions. In total, Centennial admits to shorting Powers $490.23 in commissions for those months. Def.'s Surreply [DE 62] at 4. Centennial also concedes that Powers was not paid an overtime adjustment for September 2005 and April 2008, and the parties are in dispute over whether she was paid overtime for October 2007. *Id.* Powers seeks to turn these two admissions of payment errors into a collective action claim on behalf of all similar Centennial salespeople.

Powers has not overcome her initial burden of showing that she and her fellow employees were victims of a common policy or plan that violated the law. She has only presented evidence of her own payment irregularities, without any evidence that this occurred to other employees. Nor has she shown the payment errors were due to a Centennial policy or plan that would inherently affect other employees in a similar fashion. Powers argues that "where there is smoke, there is usually fire." *See* Pl.'s Reply ISO Class Cert. [DE 36] at 6, 7. But that's hardly what I'm looking for when considering whether a plaintiff has made an initial factual showing sufficient to cause notice to be sent to other employees. Although the test to reach the notice stage for an FLSA collective action is not onerous, more is required than evidence of one single plaintiff's paycheck shortages. I can find no FLSA case where notice was ordered sent based on one person's individualized evidence of an FLSA violation and no indications of a company policy or plan to blame.

Cases relied upon by Powers are all distinguishable because they approved of collective action opt-in notifications only after acknowledging preliminary evidence of FLSA violations for more than one employee. *See Heckler v. DK Funding, LLC*, 502 F.Supp.2d 777, 780 (N.D. Ill.

2007) (relying on deposition testimony from defendant's manager that the time sheets of employees as a whole were edited, resulting in the non-payment of overtime); *Garcia v. Salamanca Group, Ltd.*, 2008 WL 818532, at * 3 (N.D. Ill. March 24, 2008)(finding a modest factual showing after seeing evidence of seventeen other employee complaints regarding overtime payments); *Dominguez v. Don Pedro Restaurant*, 2007 WL 271567, at * 1(N.D. Ind. Jan 25, 2007)(discussing declarations submitted by three non-plaintiff waitresses, each stating that they were not paid overtime).

The parties debate whether a plaintiff must demonstrate that other employees have an interest in joining a collective action before a court can order notification, but I do not have to resolve that issue.  It's enough to say that an employee must present *some* evidence that at least one other employee was harmed.  If there is no evidence that there are any other employees involved, let alone similarly situated employees, allowing for opt-in notification and discovery throws a huge burden upon defendants without any indication that the goals of the collective action mechanism are likely to be met.  *Woods v. New York Life Ins.* Co., 686 F.2d 578, 581 (7th Cir. 1982).

Permitting this FLSA claim to go forward as a collective action would have the effect of turning every individual violation of the FLSA into a bulky collective action.  Before an employer needs to notify employees of potential wage problems, there should be some showing that the practice  – if not widespread – at least has occurred more than once.  In other words, before Pandora's Box is opened, there needs to be some evidence that something of interest is inside.

At first glance, it may seem unfair to deny a request for collective action before the

plaintiff has had a chance to even take discovery from the defendant about her fellow employees. But on closer review, Powers' task was not so insurmountable. Nothing prevented her from talking to and interviewing fellow co-employees to find those that were similarly situated. Although I would expect most defendants to vehemently fight against any class discovery before approval of collective action is given, in this case, Powers filed her motion for collective action prior to even receiving Centennial's answer to her complaint. She did seek some class discovery, but never sought a motion to compel which challenged Centennial's position that it would not provide class-wide discovery until after the certification motion was addressed. *See* April 23, 2009 Hr. Tr. [DE 64] at 58-59.

In sum, Powers hasn't produced any other employee affidavits or declarations describing similar pay problems. Without putting a precise number on how many other employees must be shown to have had these problems to trigger the FLSA notice requirement, I can say with certainty that zero is not enough. *Compare Boyd v. Jupiter Aluminum Corp*, 2006 WL 1518987 at * 5 (May 31, 2006 N.D. Ind. 2006)(relying on submission of three employees' affidavits in certifying opt-in class); *Fravel v. County of Lake*, 2008 WL 2704744 at * 3 (July 7, 2008 N.D. Ind. 2008) (relying on Plaintiffs' furnishment of 30 affidavits to certify collective action) *with Flores*, 289 F. Supp. 2d at 1046 (finding that demonstration of payment practice from two out of fifty employees "does not rise to the level of a common policy or plan by [Defendant] that violated the FLSA").[1]

### B. Non-Individualized FLSA Claims

------

[1] Of course, Powers still has a claim available to her for the individual violations of her FLSA rights, she just cannot pursue a collective action based on those injuries.

In contrast to the FLSA claims based purely on Powers' complaints of being shorted on commissions and overtime, Powers makes two other FLSA claims which do call into question Centennial's payment policies. These claims represent more than a "where there's smoke, there must be fire" argument. They are based upon Centennial's policies, not individual payment discrepancies. The first involves Centennial's failure to promptly pay commissions, and the second deals with how Centennial made deductions from employees' paychecks. I take up each of those issues next.

### 1. Failure of Prompt Payment

Powers challenges Centennial's policy of paying its employees overtime adjustments approximately a month to a month and a half after commission advances are paid. She says this violates 29 C.F.R. § 778.106,[2] a regulation which supplements the implicit requirement in the FLSA for prompt payment and provides for the "general rule" that "overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends." *Id.; see also Dominici v. Board of Educ. of City of Chicago*, 881 F.Supp. 315, 319-20 (N.D.Ill.1995).

Centennial's Payroll & Benefits Director explained in his affidavit that the company does not pay commissions to its salespeople until about a month after a sales period ends, and then pays an adjusted commission-based overtime only at a date subsequent to the commission payment. For example, for sales made in December 2006, Powers was paid her commission on

_____

[2]Though the Secretary of Labor's interpretative guidelines are not binding, they are taken as persuasive authority as to Congress's legislative intent. *See Shaw v. Prentice Hall Computer Pub., Inc.*, 151 F.3d 640, 642 (7th Cir. 1998)(citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1228 (5th Cir.1990)).

January 31, 2007 and her commission-based overtime on February 16, 2007.[3]  *See* Silvan

1/12/09 Aff. [DE 29-3], ¶¶17-18.  For her August 2007 sales, she was paid her commission on

September 28, 2007 and her commission-based overtime on October 12, 2007. *Id.*, ¶¶ 19-20.

Centennial does not deny that its practice is to pay its employees their commissions

approximately a month after the sales period ends and their overtime adjustments weeks after it

pays their commissions, nor does it suggest that Powers is the only employee to be treated in

such fashion. Def.'s Surreply [DE 62] at 19-20.   There is little dispute, then, that there are

numerous Centennial salespeople who are similarly situated to Powers, and that if the timing of

these payments possibly violates the FLSA, then collective action will be appropriate.

Centennial instead argues that the commissions are not "earned" by Powers – as that term

is used in § 778.106 – until six months after the commissions are paid.  Language to this effect

exists in Centennial's Sales Compensation Plan, handed out to employees like Powers.  Sales

Compensation Plan [DE 9-5] at 5.  The argument goes that because the commissions are not

"earned" when the sales are made, but are only graciously "advanced" some months ahead of

time, no FLSA violation of § 778.106 occurs for late overtime payment.

Centennial does not provide any evidence suggesting that once its employees'

commissions are paid, the subsequent delay in overtime payment is due to some difficulty in

crunching the numbers or other pragmatic considerations.  As stated, its argument relies on the

definition of "earned" and the position that its salespeople don't earn their commissions until six

months after the sale.  There exists an exception to the "general rule" found in § 778.106 which

---

[3]Centennial does not challenge Powers' spreadsheet identifying the available pay dates occurring
while she was employed by Centennial. *See* Weldy Aff. [DE 36-2], ¶ 13; Pay Periods Spreadsheet [DE
36-10].  Powers' spreadsheet shows that pay periods occurred on January 5, 2007; January 19, 2007;
February 2, 2007; and February 16, 2007.  *Id.*

allows an employer to delay payment of overtime "when the correct amount of overtime compensation cannot be determined until some time after the regular pay period." In such cases, overtime must be paid "as soon after the regular pay period as is practicable" and "may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due."  But it is unclear if Centennial wished to invoke that exception, and if it did, it provided no reason why the overtime could not be determined until well after the pay period. Thus, Centennial's challenge to certification of this claim hinges solely on its proposed definition of "earned."  I find, however, that Powers has made a modest factual showing that her commissions were earned at the time of the sale.

The question of what it means to "earn" an overtime compensation for purposes of 29 C.F.R. § 778.106 is not one directly addressed by statute or caselaw.  But the term "earned" shows up elsewhere in the regulations, and that seems like a sensible place to start. 29 C.F.R. § 778.119, which addresses not only late overtime payments, but their intersection with commissions, says:

> If the calculation and payment of the commission cannot be completed until sometime after the regular pay day for the workweek, the employer may disregard the commission in computing the regular hourly rate until the amount of commission can be ascertained. . . When the commission can be computed and paid, additional overtime compensation due by reason of the inclusion of the commission in the employee's regular rate must also be paid. To compute this additional overtime compensation, it is necessary, as a general rule, that **the commission be apportioned back over the workweeks of the period during which it was earned**. The employee must then receive additional overtime compensation for each week during the period in which he worked in excess of the applicable maximum hours standard. (emphasis added).

So the regulations envision the circumstance where a commission is paid later than a sale, and by providing for the commission to be "apportioned back" to when it was "earned," strongly suggests that the "earning" of that commission occurs earlier than the payment.

Centennial's business practice is nearly described verbatim by § 778.119. In fact, as will be shown below, Centennial's own practice reveals that, despite what it says in its Sales Compensation Plan, it also believes what commonsense otherwise dictates – that its employees earn their commissions at the point of sale.

Centennial argues that § 778.119 excuses its delayed overtime payments, presumably because it stands for the general principle that employers can wait a certain time to calculate commissions into the regular rate. Def. Surreply [DE 62] at 19. However, the rule requires that "the commission be apportioned back over the workweeks of the period *during which it was earned*." It appears that Centennial followed this portion of the regulation, but not in the manner in which its litigation position would dictate. Centennial has explained that it apportioned Powers' commissions in the months that the sales were made, not at some date six months down the road. *See* Silvan 1/12/09 Aff. [DE 29-3], ¶¶ 23-31; Silvan 3/9/09 Aff. [DE 62-3], ¶ 11-13. For example, Powers was paid a commission "advance" on July 31, 2007 for sales made in June 2007. Silvan 1/12/09 Aff. [DE 29-3], ¶ 23. When later calculating and paying her overtime adjustment, Centennial used that July 31 advance to re-calculate a regular rate, and later paid Powers an overtime adjustment by multiplying that regular rate by the hours *worked in June*. *Id*. If Centennial really believed she earned the commission six months later in December 2008, and to be consistent with § 778.119, it should have applied the new regular rate to hours worked in December. Instead, the application of Centennial's payment practices to the FLSA's use of the term "earned" supports the notion that employees earn their commissions during the month in which the sales generating those commissions are made.

In any event, § 778.119 only allows for a limited delay in overtime adjustment payments.

The payment of the commission can be delayed "until the amount for commission can be ascertained." The rule does not provide for further delay once the commission can be calculated. "When the commission can be computed and paid, additional overtime compensation due by reason of the inclusion of the commission in the employee's regular rate must also be paid." As shown earlier, Centennial did not pay its overtime adjustment at the same time as its commission payment (which itself was delayed a month), but waited a couple of weeks. There is no explanation as to why, once the commission can be ascertained, the overtime adjustment could not be paid concurrently.

Centennial's position is rooted in the idea that an employer has the freedom to choose at which later date a salesperson officially "earns" her commission. In the example above, if Powers did not work enough hours in December to qualify for overtime, she would not have to be paid any overtime despite putting in the extra hours earlier in June. Taken to the extreme, Centennial could sit and wait for a month in which its employee comes up short on hours, jump in and shout "earned!" and avoid paying any commission-based overtime at all. In *Howard v. City of Springfield, Illinois*, 274 F.3d 1141, 1149 (7th Cir. 2001), a case dealing with 29 U.S.C. § 207(e) and a dispute over when premium pay credits could be used to offset an employer's overtime liabilities, the Seventh Circuit used a similar example to show why an employer could not be permitted to pick and choose its payment months to maximize its own profits at its employees' expense. The Seventh Circuit stated that the FLSA does not allow an employer to "manipulate the payments to suit its economic concerns," and added that "[the employer's] interpretation is completely divorced from the purpose of the FLSA." *Id*.

Looking in other contexts, earned commissions are not defined in the way Centennial

proposes.  For example, in the bankruptcy setting, high priority is given to claims on commissions "earned" by an individual within a few months of the petition date.  11 U.S.C. § 507(a)(4)(A) (formerly § 507(a)(3)(A)). In determining when the commissions were earned for purposes of this bankruptcy law, courts focus on the time the employee's services which gave right to the commissions were performed, not when the commissions became payable.  *See Gallivan v. Springfield Post Road Corp.*, 110 F.3d 848, 852 (1st Cir. 1997)("On this record, we cannot find clear error in the court's determination that appellants had earned their commission in the sense that they had done all that they were obligated to do prior to the debtors' filing and that their further efforts were gratuitous."); *In re Myer*, 197 B.R. 875, 877 (Bankr. W.D.Mo. 1996); *In re Cardinal Industries, Inc.*, 160 B.R. 83, 85 (Bankr. S.D. Ohio 1993).  It's for the same reason that one court noted, albeit in a different context, that "[a] fee is earned not when it is received but when the service for which it is paid is actually performed."  *Christakos v. Intercounty Title Co.*, 196 F.R.D. 496, 503 (N.D. Ill. 2000).

In Powers' case, while the final amount of commission may have taken up to six months to determine, Powers has made a showing that the delay was not due to a need for further services on her part.  It seems she did all she had to do to get the commissions; but that she and Centennial were just waiting six months for the dust to settle.  Whatever the commission turned out to be, Powers likely "earned" them at the point of sale, or at least that is what the evidence seems to suggest at this point.

Centennial's position is supported almost entirely on one statement found in its Sales Compensation Plan, but rights bestowed by the FLSA may not be taken away by contract, as they have been held "nonwaivable."  *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S.

14

728, 740 (1981). Agreements between employer and employee are not determinative because "congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement." *Howard v. City of Springfield, Illinois*, 274 F.3d at 1143-44 (citing *Barrentine*, 450 U.S. at 740-41). After all, it was the disparity in employer/employee bargaining power that prompted FLSA legislation in the first place. *Id*. at 740; *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945). It's for this reason "that requirement [to pay overtime in a timely fashion] may not be waived, and even the workers' enthusiastic assent to deferred payment – a form of employer-held savings account – is ineffectual." *Howard*, 274 F.3d at 1148 (citations and quotation marks omitted).

To reach the next step of certification, Powers needed only to produce enough evidence to show she has a basis for a claim that she and other similarly situated employees were subjected to a policy that violated the FLSA. As a result of all of the considerations discussed above, Powers is permitted to enact the opt-in notification stage for her FLSA claim based upon untimely overtime adjustment payments.

### 2. Use of charge backs as violation of FLSA

Powers' second non-individualized FLSA claim pertains to Centennial's practice of applying charge backs to employee paychecks. When a customer cancels or downgrades a plan, Centennial takes money out of its salespersons' paychecks in order to make up for earlier paid commission "advances" that are now too high. Powers argues that this practice violates 29 C.F.R. § 778.117, which requires commissions to be included in the regular rate. Powers claims that Centennial is violating § 778.117 "by failing to apportion all monthly commission earned." Pl.'s Reply ISO Class Cert. [DE 36] at 7. She says this is so because when Centennial plugs a

monthly commission into its formula for calculating overtime, it is also using charge backs that correspond with a much earlier month's sales activities. In doing so, Powers charges that Centennial "lowers commissions to be apportioned for overtime adjustments by subtracting charge backs that have nothing to do with the sales made or commissions earned during the commission month." *Id*.

This claim is foreclosed by 29 C.F.R. § 778.121. For purposes of a motion to certify a class, the court does not typically reach the merits of the complaint. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."). However, the Seventh Circuit has instructed district courts to make "whatever factual and legal inquiries are necessary under Rule 23." *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 676 (7th Cir.2001). And the same guidance has been followed in the closely analogous collective action setting. *Howard v Securitas Security Services, USA Inc.*, 2009 WL 140126, at *5 (N.D. Ill Jan. 20, 2009); *Muecke v. A-Reliable Auto Parts and Wreckers, Inc.*, 2002 WL 1359411, at *1 (N.D. Ill. June 21, 2002). Since the first prong of the collective action test asks Powers to make a modest factual showing that she and the other employees were <u>victims</u> of common policy or plan that <u>violated the law</u>, *see Russel v. Illinois Bell Telephone Co.*, 575 F.Supp.2d 930, 933 (N.D. Ill. 2008), the collective action cannot go forward if the law clearly allowed Centennial's actions.

The law in question, 29 C.F.R. § 778.121 provides:

> If there are delays in crediting sales or debiting returns or allowances which affect the computation of commissions, the amounts paid to the employee for the computation period will be accepted as the total commission earnings of the employee during such period, and the commission may be allocated over the period

from the last commission computation date to the present commission computation date, <u>even though there may be credits or debits resulting from work which actually occurred during a previous period</u>. The hourly increase resulting from the commission may be computed as outlined in [29 C.F.R. § 778.120].(emphasis added).

Centennial's system of applying charge backs for customer cancellations on sales made months previously is authorized by this regulation. According to § 778.121, a commission paid in Month 6 for sales made in Month 6 may incorporate credits and debits associated with sales made in Month 1. In other words, the very problem Powers has with Centennial's practice is one expressly permitted by the code. So Powers may not seek a collective action on this claim.

II.     **Rule 23 Class Action Certification**

Powers seeks to certify her state law claims as a class action under Rule 23. However, a growing number of courts, especially in this circuit, are beginning to look askance at wage actions seeking both Rule 23 class action and FLSA collective action certification. *Ervin v. OS Restaurant Services, Inc.*, 2009 WL 1904544 at ** 2-3 (N.D. Ill. July 1, 2009). *Marquez v. Partylite Worldwide, Inc.*, 2007 WL 2461667 at * 6 (N.D. Ill Aug. 27, 2007); *Riddle v. National Sec. Agency, Inc.,* 2007 WL 2746597 at * 3 (N.D.Ill. 2007 Sept. 13, 2007); *Thiebes v. Wal-Mart Stores, Inc*., 2002 WL 479840 at ** 2-4 (D. Or. 2002); *Muecke,* 2002 WL 1359411 at *2; *McClain v. Leona's Pizzeria, Inc.,* 222 F.R.D. 574, 577-78 (N.D. Ill. 2004); *Rodriguez v. The Texan, Inc.,* 2001 WL 1829490 at *2 (N.D.Ill. Mar.7, 2001); *see also* Matthew W. Lampe & E. Michael Rossman*, Procedural Approaches for Countering the Dual-Filed FLSA Collective Action and State-Law Wage Class Action*, 20 LAB. LAW. 311 (2005).

This skepticism is well-founded because there is an incompatibility between the Rule 23 opt-out notice procedures and the FLSA collective action opt-in mechanisms. *Ervin*, 2009 WL

1904544 at *2. For starter, if both types of action were allowed to proceed, the necessary notices sent to class members would be inherently confusing. *See De La Fuente v. FPM Ipsen Heat Treating, Inc.*, 2002 WL 31819226 at * 2 (N.D. Ill. Dec. 16, 2002). One notice would have to explain to the employees that they need to take affirmative steps just to back out of the suit, while the other would ask for affirmative steps just to join.

There's also a more fundamental reason to not mix the two types of actions. The opt-in provision of the FLSA, requiring that written consent be given before adding a potential plaintiff to an action, was created in 1947 in response to excessive litigation brought by plaintiffs without any personal interest in the outcome of a case. *See Hoffman-La Roche Inc.,* 493 U.S. at 173. "The relevant amendment was for the purpose of limiting private FLSA plaintiffs to employees who asserted claims in their own right and freeing employers of the burden of representative actions." *Id.* This goal would be thwarted if, by virtue of combining a Rule 23 class action and FLSA collective action, everyone falling within the definition of the Rule 23 class was brought into an FLSA action despite never having opted in. The Rule 23 plaintiffs would almost certainly outnumber the collective action plaintiffs thus making the litigation far more burdensome on employers than anticipated by the drafters of the FLSA. *See Riddle*, 2007 WL 2746597 at * 3.

All of these factors fold into the Rule 23(b)(3) analysis questioning the superiority of the class action over other available methods of adjudicating the controversy. *See e.g., McClain*, 222 F.R.D. at 578. The courts addressing this issue have been particularly wary of granting class certification to plaintiffs who brought their claims originally in federal court, as Powers did, in contrast to those state plaintiffs that had their claims removed by defendants and were only then

subjected to the Federal Rules of Civil Procedure and its class action requirements. *See Ervin,* 2009 WL 1904544 at * 2; *Riddle*, 2007 WL 2746597 at * 3; *c.f. Ladegaard v. Hard Rock Concrete Cutters, Inc.,* 2000 WL 1774091 at ** 1, 7 (N.D. Ill. Dec. 1, 2000)(granting certification in case where defendant removed matter to federal court). In light of this fact and the difficulties presented by the dual wage claim rendering it an inferior method of resolving the controversy, Powers' motion for class certification is denied for her state claims.

## C.    Motion to Amend

Powers also has pending a motion to amend her complaint. Under Federal Rule of Civil Procedure 15(a) a party is not entitled to amend a pleading as a matter of course but she may do so with the opposing party's written consent or by leave of court. The rule reflects a liberal attitude toward amending pleadings and instructs the district court to "freely give leave when justice so requires." Fed. R. Civ. Pro. 15(a); *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). District courts are afforded broad discretion to decide motions for leave to amend pleadings. *Id.* But if an amended complaint would be futile, then the request to amend should be denied. *Chavez v. Illinois State Police*, 251 F.3d 612, 632 (7th Cir. 2001). Futility is defined by the Seventh Circuit as the capacity of the amendment to survive a motion to dismiss. *Crestview Village Apts. v. U.S. Dep't Of Housing & Urban Dev.,* 383 F.3d 552, 558 (7th Cir.2004); *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Com'n.*, 377 F.3d 682, 687 and n. 3 (7th Cir. 2004).

As discussed extensively in my previous orders addressing Centennial's Motion for Judgment on the Pleadings and Powers' Motion to Certify Question to State Court, the Indiana statutory exemption for salaried employees eligible for overtime under the FLSA is applicable to

Powers. *See* May 18, 2009 Order [DE 65]. Powers' attempt to amend the complaint under the Wage Payment Statute is clearly futile, as it would be precluded by the same statutory exemption. Powers conceded this eventuality in her brief. *See* Ind. Code § 22-2-5-1.1; Pl.'s Reply Br. in Supp. of Mot. to Am. [DE 54] at 11, fn. 1. Her request to add that claim is therefore denied.

Her new alternative claim for wrongful deductions, seeking relief solely from the Wage Deductions Statute, is a thornier issue. The parties dispute whether the commissions paid are "wages" for purposes of the statute, or whether they were just "unearned advances" and therefore not subject to the requirements of the rule. Centennial says there is obviously no liability under the Wage Deduction Statute because the commission payments are not wages. It seeks to invoke an exception to Indiana's general rule that "a person employed on a commission basis is entitled to her commission when the order is accepted by the employer." *Robinson v. Century Personnel, Inc.*, 678 N.E.2d 1268, 1270 (Ind. Ct. App. 1997); *see* Def.'s Opp. to Mot. to Am. [DE 41] at 13. The general rule "may be altered by a written agreement by the parties or by the conduct of the parties which clearly demonstrates a different compensation scheme." *Vector Eng'g and Mfg. Corp. v. Pequet*, 431 N.E.2d 503, 505 (Ind. Ct. App. 1982).

Centennial insists such an alteration occurred because of 1) the written Sales Compensation Plan which calls commissions unearned advances at the time of their payments and 2) Powers' acknowledgment of the Sales Compensation Plan's terms through her acceptance of payments and continued employment. *See* Def.'s Opp. to Mot. to Am. [DE 41] at 13-14. This evaluation of evidence beyond the complaint is inappropriate under a motion to dismiss, and perhaps even more so under the lenient futility standard Centennial must meet to defeat a motion

to amend. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Com'n.*, 377 F.3d at 687.

The decisions cited by Centennial in support of its wages argument are not dispositive because they were issued at the summary judgment stage or later. *See Gress v. Fabcon, Inc*., 826 N.E.2d 1 (Ind. Ct. App. 2005); *Design Industries, Inc. v. Cassano*, 776 N.E.2d 398 (Ind. Ct. App. 2002); *Robinson v. Century Personnel, Inc.*, 678 N.E. 2d 1268 (Ind. Ct. App. 1997); *New Frontiers, Inc. v. Goss*, 580 N.E.2d 310, 311-12 (Ind. Ct. App. 1991); *Licocci v. Cardinal Associates, Inc.*, 492 N.E.2d 48, 56 (Ind. Ct. App. 1986)*; Vector*, 431 N.E.2d at 504-506. Many of the cases dealing with policies or contracts measured the language of the statute against those documents, but also contemplated outside evidence in making their decisions as to whether an employee is entitled to a commission. *Gress*, 826 N.E.2d at 4; *Vector*, 431 N.E.2d at 505; *Helmuth v. Distance Learning Systems Indiana*, 837 N.E2d 1085, 1090-91 (Ind. Ct. App. 2005). In this vein, Centennial similarly asks me to look at both the company's policy and the conduct of the parties. *See* Def.'s Opp. to Mot. to Am. [DE 41] at 13-14. This would require determining the futility of the amended claims under a summary judgment standard, when this litigation has not yet passed through the initial stages of discovery. Centennial has not shown why I should decide this particular case in quicker fashion than the decisions Centennial cited to itself. In other words, Centennial is putting the cart before the horse. At this point, I only need to decide if this is a viable claim, and it is.

Powers also proposes a new breach of contract claim, based upon Centennial's alleged failures to pay all commission wages due and owing. Am. Complaint [DE 32-2], ¶ 14. Centennial challenges this claim as futile as well, but in this instance, meets its burden by conclusively showing that Powers would not survive a motion to dismiss. Powers says the claim

survives because there is an existing contractual relationship between the parties and that the

Sales Compensation Plan represents the terms and conditions of that contract. *See* Mot. to Am.

[DE 54] at 13. However, while Powers effectively shows that under Indiana law, an

employer/employee relationship is contractual (even if it's an at-will relationship), the Sales

Compensation Plan cannot be the contract that Powers relies on in making his claim. This is

because courts in Indiana have not looked kindly upon breach of contract claims based on

employee handbooks. This is especially true when they contain disclaimers saying something to

the effect of "This Is Not A Contract." *Hayes v. Trustees of Indiana University*, 902 N.E.2d 303,

312-13 (Ind. Ct. App. 2009); *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 892-93 (Ind. Ct.

App. 2007); *City of Indianapolis v. Byrns*, 745 N.E.2d 312, 317 n. 3 (Ind. Ct. App.2001). When

there is such a disclaimer, the handbook "certainly cannot be said to contain a 'clear promise'

which plaintiffs could reasonably believe constitutes an 'offer.'" *McCalment v. Eli Lilly & Co.*,

860 N.E.2d 884, 892 (Ind. Ct. App. 2007). And in the absence of an offer, there can be no

contract. *Orr v. Westminister Village North, Inc.*, 689 N.E.2d 712, 720 (Ind. 1997).

Centennial's Sales Compensation Plan has such a disclaimer. Sales Compensation Plan [DE 9-

5] at 2. Powers' motion to add a breach of contract claim is therefore denied as futile.

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion to Certify Collective Action Status [DE 9] is

**GRANTED in part** for the FLSA claim as described in this order**.** The following class will

have collective action status:

All future, present and former Inside Sales Representative of Centennial

Communications Corp. who have worked overtime hours which should have been

paid on or after September 11, 2005.

Furthermore, Centennial is **ORDERED** to submit to Powers within thirty days of the entry of this Order, in electronic format, the following information: the names, addresses, telephone numbers, dates of employment, location of employment, and date of birth of all potential plaintiffs.

Powers' Motion for Class Action Certification under Rule 23 [DE 9] for her state law claims is **DENIED**.

Powers' Motion to Amend her Complaint [DE 32] is **GRANTED in part** and **DENIED in part.** Powers may amend her complaint to add her proposed claim brought pursuant to the Wage Deduction Statute only. Centennial's request for costs and fees relating to the Motion to Amend is **DENIED**. Powers is **ORDERED** to file a new proposed amended complaint within 10 days from the entry of this order that reflects the addition of the Wage Deduction Statute claim, as discussed in this opinion.

**SO ORDERED.**

**ENTERED**: December 14, 2009

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT